FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

ADVOCATE LAW GROUPS OF
FLORIDA, P.A., JON B. LINDEMAN, JR.,
and EPHIGENIA K. LINDEMAN,

    Defendants.

CASE NO. 6:18-cv-1836-ORL-28-GJK

_____

UNITED STATES OF AMERICA'S
COMPLAINT AND DEMAND FOR JURY TRIAL

The United States of America ("United States") alleges as follows:

## NATURE OF THE ACTION

1. This is a civil action brought by the United States to enforce the provisions of

    the Fair Housing Act, 42 U.S.C. §§ 3601-3619 ("FHA").

2. This action is brought pursuant to 42 U.S.C. § 3612(o) on behalf of Lucía

    Hurtado, Noemí Román, Daniel Román, Daniel Román, Jr., Dariel Román,

    Argentina Roque, and Amado Roque (collectively, the "Complainants").  It is

    also brought pursuant to the United States Attorney General's authority under

    42 U.S.C. § 3614(a) to seek redress for a pattern or practice of housing

discrimination and for discrimination that raises an issue of general public importance.

## JURISDICTION AND VENUE

3. The Court has jurisdiction over this action under 42 U.S.C §§ 3612(o), 3614(a) and 28 U.S.C. §§ 1331, 1345.

4. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the United States' claims occurred there.

## THE COMPLAINANTS AND PARTIES

5. Complainant Lucía Hurtado, born in Colombia, is Hispanic and a native Spanish-speaker who is limited English proficient.  At all times relevant to this Complaint, she resided at 2729 Palm Isle Way, Orlando, Florida 32829.

6. Complainants Noemí and Daniel Román, both born in Puerto Rico, are Hispanic and native Spanish-speakers who are limited English proficient.  At all times relevant to this Complaint, they resided with their two sons, Complainants Daniel Román, Jr. and Dariel Román, at 1000 Meller Way, Orlando, Florida 32825.

7. Complainant Argentina Roque, born in the Dominican Republic, is Hispanic and a native Spanish-speaker who is limited English proficient.  At all times

relevant to this Complaint, she resided with her son, Complainant Amado
Roque, at 7608 Aviano Avenue, Orlando, Florida 32819.

8. Defendant Advocate Law Groups of Florida, P.A., ("ALG") is a Florida
corporation with its principal place of business at 15100 N.W. 67th Avenue,
Miami Lakes, Florida 33014. ALG opened in 2008. During the period from
2009 to 2015, ALG maintained offices in the counties and cities of Broward,
Dade, Naples, Palm Beach, Orlando, Tampa, Bonita Springs, and
Jacksonville, Florida. From 2009 through at least 2015, ALG purported to be
a legal services provider and offered mortgage loan modification and
foreclosure rescue services. ALG has marketed, and continues to market,
itself under the name "Algoflaw" and operates the website
www.algoflaw.com.

9. Defendant Jon B. Lindeman, Jr. ("Jon Lindeman") is a licensed attorney and
the General Managing Partner and President of ALG. Jon Lindeman opened
ALG with his wife, Defendant Ephigenia K. Lindeman ("Effie Lindeman"),
in 2008. At all times relevant to this Complaint, Jon Lindeman oversaw,
supervised, directed, or controlled the activities of ALG.

10. Defendant Effie Lindeman is the Chief Financial Officer of ALG. From 2008
to about 2009, Effie Lindeman served as the Director of Operations. At all
times relevant to this Complaint, Effie Lindeman served as ALG's Director of

Marketing, and Chief Mortgage Investigator and Auditor. Among other duties, Effie Lindeman oversaw, supervised, directed, or controlled ALG's day-to-day operations relating to mortgage modification and foreclosure rescue services, including collections and communications with mortgage lenders on behalf of ALG's clients. In 2016, Effie Lindeman obtained her real estate license, but she is not a licensed attorney.

## FACTUAL ALLEGATIONS

11. From 2009 through at least 2015, Defendants, individually and through other representatives and agents, deliberately targeted Complainants and other homeowners because of their Hispanic national origin for a scheme involving unfair and predatory loan modifications and foreclosure rescue services.

12. Defendants' business model during time period was to target Hispanic homeowners with Spanish-language advertising that falsely promised to cut their mortgage payments in half. Defendants made the same representations to Complainants and other Hispanic homeowners in person, promising lower payments in a specific timeframe in exchange for thousands of dollars of upfront fees and continuing monthly fees of as much as $550. Despite charging high fees, Defendants did not obtain the promised loan modifications. Defendants knowingly placed their clients' homes at risk of foreclosure by instructing Complainants and other clients to stop making

monthly mortgage payments and to stop communication with their lenders.

13. Defendants targeted their mortgage modification scheme to Hispanic homeowners in Florida through advertising on Spanish-language radio and television stations, and via online advertisements. Between 2009 and 2015, Defendants marketed their mortgage modification scheme on fourteen radio stations, of which twelve were Spanish-language and one bilingual, and nine television stations, of which eight were Spanish-language.

14. Defendants' advertisements misrepresented that Defendants could quickly obtain mortgage modifications that would reduce homeowners' mortgage payments. In fact, Defendants took little action to obtain modifications.

15. For example, in one of Defendants' Spanish-language advertisements, the spokesperson falsely stated that as many as 45 percent of all homeowners who obtained a mortgage between the years 1997 and 2008 were not obligated to continue paying their mortgage due to fraud by their lender.

16. In another of Defendants' Spanish-language television advertisements, the spokesperson claimed that ALG could cut homeowners' mortgage payments in half and save their homes. Defendants had no basis for this claim. In order to obtain the trust of Complainants and other Hispanic homeowners, the spokesperson called ALG "la firma de la comunidad," which literally translates as "the community's law firm."

5

17. Defendants exploited the limited English proficiency of Complainants and other Hispanic homeowners. Their advertising was in Spanish, and meetings were conducted in Spanish, but Defendants required their clients to sign English-language contracts, with only payment provisions translated.

18. Most of Defendants' staff who worked on mortgage modifications were Hispanic and Spanish-speaking.

19. Complainants and other Hispanic homeowners sought the loan modifications promised by Defendants in order to secure the financial assistance necessary to either reduce their monthly mortgage payments or maintain their homes and avoid foreclosure.

20. Complainants and other homeowners could have applied for loan modifications on their own at no cost or with the aid of a no-cost counselor approved by the United States Department of Housing and Urban Development (HUD).

21. Given the limited value of Defendants' services, the upfront and monthly fees collected by Defendants constituted unfair terms for loan modification services. The three sets of HUD Complainants each paid thousands of dollars in total to ALG. Ms. Hurtado paid approximately $8,420; the Románs paid at least $13,500; and the Roques paid at least $18,500. On information and belief, other Hispanic homeowners also paid similar fees.

22. Defendants took actions that interfered with the abilities of Complainants and other homeowners to maintain their homes or to receive legitimate financial assistance to maintain their homes.

23. Defendants' conduct harmed, and continues to harm, the United States' sovereign interest in ensuring compliance with the FHA.

### Discrimination Against Complainant Hurtado

24. In or about February 2014, Complainant Lucía Hurtado owned and resided in a single-family home located at 2729 Palm Isle Way, Orlando, FL 32829.

25. At that time, Ms. Hurtado was current on her mortgage for the property. She also had a modification agreement with her lender, but the mortgage payments were scheduled to increase, and she wanted a fixed mortgage payment.

26. In or about February 2014, Ms. Hurtado watched an advertisement for ALG's loan modification services on Spanish language television.

27. On or about February 24, 2014, she went to ALG's office in Orlando and met with an ALG employee, Alex Anaya. Mr. Anaya conducted the meeting in Spanish. Ms. Hurtado only sought mortgage modification assistance and did not request or seek Defendants' assistance with any other matters.

28. At that meeting, Ms. Hurtado signed a retainer agreement. The retainer agreement was written almost entirely in English. The agreement required

Ms. Hurtado to pay ALG an advance fee of $5,700 for mortgage modification assistance.

29. At Ms. Hurtado's initial meeting with ALG in February 2014, Mr. Anaya told her to stop making her mortgage payments.  Following these instructions, Ms. Hurtado stopped making mortgage payments and communicating with her mortgage servicer immediately after retaining ALG.

30. During the February 2014 meeting, Mr. Anaya also told Ms. Hurtado that a loan modification would require an advance fee of $5,700.  Mr. Anaya told Ms. Hurtado that she would be fined if she ever stopped paying ALG the monthly fee.

31. Ms. Hurtado paid ALG approximately $2,000 within a few weeks of signing the retainer agreement and subsequently paid monthly installments of $535 per month for the loan modification services.

32. On or about February 28, 2014, ALG mailed a large package of form letters to Ms. Hurtado, all in English, that said "[t]his package contains the exact documents that we have sent to the bank on your behalf."  One letter in the package, from Jon Lindeman, requested that Ms. Hurtado's mortgage be rescinded in exchange for her returning her home to the bank.  Ms. Hurtado never discussed with nor authorized ALG to seek a rescission from her lender

or servicer, and rescission was directly contrary to Ms. Hurtado's desire to keep her home.

33. Another letter in the February 28, 2014, package alleged that the lender had committed fraud and Truth in Lending Act violations and had engaged in other unlawful conduct. The letter claimed that these allegations were based on a mortgage audit of Ms. Hurtado's closing package, exhaustive mortgage transaction research by ALG, and interviews with people who had knowledge of the practices and policies of the parties to Ms. Hurtado's mortgage transaction. ALG's client file for Ms. Hurtado did not contain any documentation substantiating ALG's claims that it had conducted an investigation.

34. In the package, ALG falsely asserted that it was providing the lender with a hardship letter, income verification, and other documentation to support a mortgage modification request. No such documentation was included as part of the package.

35. Thereafter, Ms. Hurtado repeatedly called ALG, but was never able to speak with anyone about the details of her case. When ALG staff returned her calls on a few occasions, ALG staff told Ms. Hurtado to provide paperwork that she had already provided to ALG multiple times.

36. Ms. Hurtado's mortgage servicer, Ocwen Loan Servicing, LLC, initiated foreclosure proceedings against her on March 19, 2015.  Nearly one month later, on April 17, 2015, ALG entered its appearance in Ms. Hurtado's foreclosure case.

37. Ms. Hurtado paid ALG approximately $8,420 over the course of approximately fourteen months, but she never received a mortgage modification or an offer of a modification while working with ALG.

38. In June 2015, Ms. Hurtado wrote a letter to ALG to cancel its services. Rather than immediately withdrawing from Ms. Hurtado's foreclosure case and giving her the opportunity to retain new counsel, ALG waited until July 23, 2015 to withdraw as counsel of record.

39. ALG never obtained a mortgage modification for Ms. Hurtado.  With no other viable alternatives, she ultimately resorted to selling her house in a short sale.

### Discrimination Against the Román Complainants

40. In or about February 2010, Complainants Noemí and Daniel Román owned and resided in a single-family home located at 1000 Meller Way, Orlando, Florida 32825.  Their sons, Complainants Daniel Román, Jr. and Dariel Román, lived with them.

41. For the two months prior to going to ALG, the Románs had not paid their mortgage.

42. The Románs first learned about ALG through advertisements on Spanish-language television and Spanish-language radio.

43. In or about February 2010, the Románs went to ALG's office in Orlando, Florida, and met with Yane Peña. Ms. Peña conducted the meeting in Spanish. The Románs only sought mortgage modification assistance and did not request or seek Defendants' assistance with any other matters.

44. During the meeting, Ms. Peña falsely promised the Románs that ALG could reduce their mortgage payment by half, and claimed that ALG had assisted some clients to secure free housing.

45. Ms. Peña advised the Románs to stop making mortgage payments to their bank, instructed the Románs not to accept any correspondence or calls from their bank, claimed that it would take no more than one year to secure the promised mortgage modification, and assured the Románs they would not lose their home. Following the instructions, the Románs ceased communication with their lender, Wells Fargo, and made no further mortgage payments after retaining ALG's services.

46. Ms. Peña also falsely asserted that the Románs could not obtain a mortgage modification from their bank without the assistance of an attorney.

11

47. Daniel Román signed a retainer agreement with ALG during the February 5, 2010 meeting. The retainer agreement was written entirely in English. The Románs requested a translation of the document, but ALG never provided one.

48. The agreement required the Románs to pay ALG an advance fee of $4,800 for mortgage modification assistance, which the Románs paid in full on February 8, 2010.

49. On February 28, 2010, ALG mailed a large package of form letters to the Románs, all in English, that stated, "[t]his package contains the exact documents we have sent to the bank on your behalf." One letter in the package, from Defendant Effie Lindeman, requested that the Románs' mortgage be rescinded in exchange for the Románs' returning their home to the lender. The Románs neither discussed with nor authorized ALG to seek a rescission from their lender, and rescission was directly contrary to the Románs' desire to remain in their home.

50. Another letter in the February 28, 2010 package from Defendant Effie Lindeman, alleged fraud, Truth in Lending Act violations, and other unlawful conduct by the Románs' lender, Wells Fargo. The letter claimed that these allegations were based on a mortgage audit of the Románs' closing package. ALG's file for the Románs did not contain any documentation substantiating

ALG's claims that ALG conducted an audit.

51. In the package, ALG falsely asserted that it was providing Wells Fargo with a hardship letter, income verification, and other documentation to support a mortgage modification request. No such documentation was provided to Wells Fargo at the time. In fact, ALG did not submit a modification request with supporting documentation to Wells Fargo until June 10, 2010, more than four months after the Románs first retained ALG.

52. On June 25, 2010, Wells Fargo filed a foreclosure complaint in court against the Románs. Within two weeks of filing the foreclosure complaint, Wells Fargo offered the Románs a mortgage modification that proposed to reduce the Románs' interest rate and monthly mortgage payment, but the terms Wells Fargo offered were drastically different from ALG's promise to reduce the Románs' mortgage payment by half. ALG staff advised the Románs to reject the mortgage modification offer, explaining that the offer was not significantly different from what they had already been paying. ALG thereafter made no attempt to negotiate better mortgage modification terms, and after two months, Wells Fargo withdrew the mortgage modification offer. ALG never obtained a mortgage modification or better mortgage modification terms for the Románs.

53. On October 7, 2010, Wells Fargo filed a motion for summary judgment in the

foreclosure action.  From October 2010 to July 2011, ALG filed no responsive pleadings.

54. In March and April 2011 and in December 2012, Wells Fargo sent letters to the Románs, advising them that they might want to consider an interest rate and mortgage payment reduction program specifically designed for borrowers, like the Románs, with loans guaranteed by the U.S. Department of Veterans Affairs.  The Románs shared these letters with ALG, but ALG staff neither discussed this program with them nor explored this option to reduce the Románs' interest rate and mortgage payment.

55. On July 14, 2011, AGL filed a motion to dismiss, which the court denied on August 8, 2011.

56. On June 3, 2013, the court granted the lenders' motion for summary judgment, and the home was set for a foreclosure sale on July 8, 2013.

57. After the foreclosure, ALG assured the Románs that ALG would get their house back and charged the Románs $2,500, plus a $550 monthly fee for an appeal of the foreclosure judgment.  On June 20, 2013, the Románs executed an appellate retainer with ALG that was almost entirely in English.

58. On July 2, 2013, ALG filed a notice of appeal on behalf of the Románs. While the appeal was pending, the Románs' home was sold and a third party

sought a writ of possession on May 4, 2014, which was awarded on May 16, 2014.

59. On August 20, 2014, the appellate court affirmed the summary judgment in favor of Wells Fargo.

60. The Románs wanted to fire ALG during the court proceedings, but when they attempted to do so, ALG staff told the Románs that their retainers with ALG were irrevocable.

61. The Románs paid ALG more than $13,500 for ALG's services, however, ALG did not obtain a mortgage modification, and, ultimately, the Románs lost their home.

### Discrimination Against the Roque Complainants

62. In January 2010, Complainant Argentina Roque owned and resided in a single-family home at 7608 Aviano Avenue, Orlando, FL 32819.  Her son, Complainant Amado Roque, lived with her.

63. The Roques were current on their mortgage payments in December 2009.

64. In or about January 2010, Ms. Roque viewed an ALG advertisement on Spanish-language television that promised a fast mortgage modification and boasted about clients' satisfaction with ALG's services.

65. In January 2010, Ms. Roque went to ALG's Orlando, Florida office to seek assistance with a mortgage modification, and met with Yane Peña.  Ms. Peña

conducted the meeting in Spanish.  Ms. Roque only sought mortgage

modification assistance and did not request or seek Defendants' assistance

with any other matters.  Ms. Peña falsely promised that ALG would reduce

the Roques' monthly mortgage payments, and assured Ms. Roque that she

would not lose her home.

66. During this meeting, Ms. Peña advised Ms. Roque that she should forward to

ALG any bank correspondence the Roques received and should not contact

the Roques' lender, Bank of America.  Ms. Peña told Ms. Roque not make

any further mortgage payments, and said she should use the money set aside

for the mortgage payments to pay ALG instead.  Following these instructions,

the Roques stopped making their mortgage payments.

67. At the same meeting, Ms. Peña represented that the Roques' loan

modification would be completed by June 2010 and explained that, if the

modification was not completed by that time, then the Roques would need to

pay an additional $395 per month for ALG's services.  ALG required the

Roques to pay a $2,800 advance fee for mortgage modification assistance.

The Roques paid this fee in installments between January and May 2010.

68. On February 26, 2010, ALG mailed a large package of form letters to the

Roques, all in English, that said, "[t]his package contains the exact documents

that we have sent to the bank on your behalf."  One letter in the package, from

Defendant Effie Lindeman, requested that the Roques' mortgage be rescinded in exchange for the Roques returning their home to their bank. The Roques never discussed with nor authorized ALG to seek a rescission from their lender, and rescission was directly contrary to the Roques' desire to keep their home.

69. Another letter in the February 26, 2010 package from Defendant Effie Lindeman alleged fraud, Truth in Lending Act violations, and other unlawful conduct by the Roques' lender, Bank of America. The letter claimed that these allegations were based on a mortgage audit of the Roques' closing package. ALG's client file for the Roques does not contain any documentation substantiating ALG's claims that it conducted an audit.

70. In the February 26, 2010 package, ALG falsely asserted that it was providing Bank of America with a hardship letter, income verification, and other documentation to support a mortgage request. No such documentation was in fact provided to the lender at that time. In fact, ALG did not submit a modification request with such supporting documentation to Bank of America until March 2013, more than three years after the Roques first retained ALG.

71. On April 20, 2010, Bank of America initiated foreclosure proceedings against the Roques. The court ultimately dismissed for lack of prosecution on June 14, 2013.

72. Bank of America filed another foreclosure complaint against the Roques on March 27, 2014. ALG entered an appearance in the Roques' foreclosure case, but did not file a responsive pleading. ALG's failure permitted Bank of America to request a default judgment on October 9, 2014, and to renew that request on January 12, 2015.

73. On many occasions when Ms. Roque called ALG, she had difficulty reaching someone who could give her an update on her request for a loan modification or on the foreclosure proceeding. When Ms. Roque as able to speak with someone at ALG regarding the status of her foreclosure proceedings, ALG staff told her not to worry and misleadingly asserted that they had taken care of everything with the court.

74. The Roques became dissatisfied with ALG's services and tried to terminate their relationship with ALG numerous times. In a telephone call ALG staff threatened Ms. Roque that if she did not continue making payments to ALG she could lose her home to foreclosure.

75. In the summer of 2014, Ms. Roque called ALG to inform them that she did not want ALG to represent her. ALG did not withdraw as counsel, and ALG continued to withdraw payments from Ms. Roque's account without her consent.

76. On or about October 22, 2014, Ms. Roque sent a letter to ALG stating that she

no longer needed their services and requested "termination of every legal service matter regarding [her] mortgage modifications."

77. ALG still did not withdraw as counsel in the foreclosure case against the Roques. Bank of America filed for another default judgment on January 12, 2015. Finally, in February ALG filed its motion to withdraw, which was granted on February 25, 2015.

78. The Roques paid ALG more than $18,500 over a four-and-a-half-year period, but the Roques never received a mortgage modification or an offer for a modification during the time they thought they were being represented by ALG.

79. After ALG withdrew from the Roques' foreclosure case, the Roques obtained a loan modification offer from Bank of America with the no-cost assistance of a nonprofit organization.

80. As a result of Defendants' discriminatory conduct, Complainants and their families suffered, and continue to suffer, actual damages, including fees for predatory and/or unfair mortgage modification services, lost housing opportunities and emotional distress.

## HUD COMPLAINTS AND CHARGE OF DISCRIMINATION

81. Pursuant to 42 U.S.C. § 3610(a), Lucía Hurtado, Noemí and Daniel Román, and Argentina and Amado Roque filed timely complaints of discrimination on the basis of national origin against the Defendants with HUD. After the filing of their complaint, Noemí and Daniel Román amended their complaint to add their sons, Daniel Román, Jr. and Dariel Román, as complainants.

82. Pursuant to 42 U.S.C. § 3610(a) an (b), the Secretary of HUD conducted and completed an investigation of each of the Complainants' respective complaints, attempted conciliation without success, and prepared one final investigative report regarding the three complaints of discrimination.

83. Based upon the information gathered in the investigation, the Secretary, pursuant to 42 U.S.C. § 3610(g)(1), determined that reasonable cause existed to believe that Defendants engaged in illegal discriminatory housing practices against each of the Complainants.

84. Therefore, on September 6, 2018, the Secretary issued a Charge of Discrimination, pursuant to 42 U.S.C. § 3610(g)(2)(A), against Defendants on behalf of each of the Complainants.

## ELECTION OF THE HUD CHARGE OF DISCRIMINATION TO FEDERAL DISTRICT COURT

85. On September 27, 2018, Defendants elected to have the claims asserted in the

Charge of Discrimination resolved in a civil action pursuant to 42 U.S.C. § 3612(a).

86. On September 28, 2018, an Administrative Law Judge issued a Notice of Election to Proceed in United States Federal District court and terminated the administrative proceeding on the Charge of Discrimination.

87. On October 1, 2018, the Secretary of HUD authorized the Attorney General to commence a civil action, pursuant 42 U.S.C. § 3612(o).

## COUNT I

88. Plaintiff re-alleges and herein incorporates by reference the allegations set forth above.

89. Complainants' properties are "dwellings" within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(b).

90. By the actions and statements referred to in the foregoing paragraphs, Defendants have:

    a. Refused to sell or rent, refused to negotiate for the sale or rental, or otherwise made unavailable, a dwelling because of national origin, in violation of 42 U.S.C. § 3604(a);

    b. Discriminated in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of national origin, in violation of 42

U.S.C. § 3604(b);

 c. Discriminated in the making available or in the terms or conditions of residential real estate-related transactions, because of national origin, in violation of 42 U.S.C. § 3605; and

 d. Coerced, intimidated, threatened or interfered with persons in the exercise or enjoyment of, or on account of their having exercised or enjoyed, their rights under the Fair Housing Act, in violation of 42 U.S.C. § 3617.

91. Complainants are "aggrieved persons" as defined in 42 U.S.C. § 3602(i) and suffered injuries as a result of Defendants' discriminatory conduct.

92. Defendants' actions described in the preceding paragraphs were intentional, willful, and taken in disregard for the rights of the Complainants.

## COUNT II

93. Plaintiff re-alleges and herein incorporates by reference the allegations set forth above.

94. By the actions and statements referred to in the foregoing paragraphs, Defendants' conduct described above constitutes:

 a. A pattern or practice of resistance to the full enjoyment of rights granted by the Fair Housing Act, 42 U.S.C. §§ 3604(a) and (b), 3605 and 3617, in violation of 42 U.S.C. § 3614(a); and

      b.  A denial to a group of persons of rights granted by the Fair Housing Act, 42 U.S.C. §§ 3604(a) and (b), 3605 and 3617, which raises an issue of general public importance, in violation of 42 U.S.C. §3614(a).

95. In addition to Complainants, there may be other victims of Defendants' discriminatory actions and practices who are "aggrieved persons" as defined in 42 U.S.C. § 3602(i).

96. These persons may have suffered, and may continue to suffer, actual injury and damages as a result of Defendants' discriminatory conduct.

97. Defendants' actions were intentional, willful, and taken in disregard for the rights of others.

**PRAYER FOR RELIEF**

WHEREFORE, the United States prays that the Court enter an ORDER that:

1. Declares that Defendants' conduct as set forth above violates the Fair Housing Act;

2. Enjoins Defendants and their agents, employees, and successors, and all other persons in active concert or participation with them from:

      a.  Discrimination on the basis of national origin in violation of the Fair Housing Act;

      b.  Failing or refusing to take such affirmative steps as may be necessary

to restore, as nearly as practicable, the victims of Defendants'
unlawful practices to the position they would have been in but for
the discriminatory conduct; and

   c. Failing or refusing to take such affirmative steps as may be necessary
   to prevent recurrence of any discriminatory conduct in the future,
   and to eliminate, to the extent practicable, the effects of their
   unlawful practices;

3. Awards monetary damages to Complainants and to all other persons harmed
   by the Defendants' discriminatory practices, pursuant to 42 U.S.C. §§
   3612(o)(3) and 3614(d)(1)(B); and

4. To vindicate the public interest, assesses a civil penalty against the
   Defendants, pursuant to 42 U.S.C. § 3614(d)(1)(C).

The United States further prays for such additional relief as the interest of
justice may require.

## JURY DEMAND

The United States hereby demands a trial by jury of all issues so triable
pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  October 29, 2018

Respectfully submitted,

JEFFERSON B. SESSIONS III
Attorney General

MARIA CHAPA LOPEZ
United States Attorney

JOHN M. GORE
Acting Assistant Attorney General
Civil Rights Division

By: *Tiffany Cummins Nick*
TIFFANY CUMMINS NICK
Assistant United States Attorney
Fla. Bar No. 0053032
United States Attorney's Office
Middle District of Florida
400 West Washington Street, Suite 3100
Orlando, Florida  32801
Telephone:  (407) 648-7500
Facsimile:  (407) 648-7643
E-Mail: Tiffany.Nick@usdoj.gov

SAMEENA SHINA MAJEED
Chief
LUCY G. CARLSON, Deputy Chief
MICHELLE TERESA GARCIA
MARTA CAMPOS
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW - NWB
Washington, DC  20530
Telephone:  (202) 353-1339
Facsimile:  (202) 514-1116
E-mail: Michelle.Garcia@usdoj.gov
E-mail: Marta.Campos@usdoj.gov

YOHANCE A. PETTIS
Assistant United States Attorney
Fla. Bar No. 021216
United States Attorney's Office
Middle District of Florida
400 North Tampa Street, Suite 3200
Tampa, Florida  33602
Telephone:  (813) 274-6000
Facsimile:  (813) 274-6198
E-Mail: Yohance.Pettis@usdoj.gov

*Attorneys for the United States of America*

# CIVIL COVER SHEET

JS 44 (Rev. 11/04)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

United States of America

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Tiffany Cummins Nick, Assistant United States Attorney

## DEFENDANTS

Advocate Law Groups of Florida, P.A., Jon B. Lindeman, Jr., and Ephigenia K. Lindeman

County of Residence of First Listed Defendant    Orange
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

Joshua M. Entin, Esq., Entin Law Group, P.A.

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☒ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question (U.S. Government Not a Party)
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

**PERSONAL INJURY**
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☒ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

### PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence
- **Habeas Corpus:**
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

### FORFEITURE/PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):
42 U.S.C. 3604(a)&(b), 3605, 3617, and 3614(a)

Brief description of cause:
Violations of the Fair Housing Act and Pattern or Practice of Violations of the Fair Housing Act

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):  JUDGE _____  DOCKET NUMBER _____

DATE  10/29/2018

SIGNATURE OF ATTORNEY OF RECORD   *Tiffany Cummins Nick*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____