UNITED STATES OF AMERICA,

        Plaintiff,

and

LUCIA HURTADO, NOEMI ROMAN,
and ARGENTINA ROQUE,

        Intervenor-Plaintiffs,

v.                                **Case No: 6:18-cv-1836-Orl-28GJK**

ADVOCATE LAW GROUPS OF
FLORIDA, P.A., JON B. LINDEMAN, JR.,
and EPHIGENIA K. LINDEMAN,

        Defendants.

---

# ORDER

The United States of America and three Intervenor-Plaintiffs bring this action under the Fair Housing Act (FHA) against Advocate Law Groups of Florida, P.A. (ALG), Jon Lindeman, Jr., and Ephigenia Lindeman—a law firm, its general managing partner, and its chief financial officer, respectively. (Compl., Doc. 1; Compl. in Intervention, Doc. 30). Plaintiffs allege that Defendants violated several of the FHA's anti-discrimination provisions by targeting Hispanic homeowners for "unfair and predatory loan modifications and foreclosure rescue services." (Doc. 1 ¶ 11; see also Doc. 30 ¶¶ 2–3 (alleging a "mortgage modification scam" and "predatory advertising")).

Defendants now move under Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiffs' claims for failure to state a claim for which relief can be granted, arguing that

even taken as true, Plaintiffs' allegations do not state a cause of action under the FHA. (Mots., Docs. 12 & 50). Defendants alternatively move for a more definite statement under Federal Rule of Civil Procedure 12(e). Having reviewed the parties' submissions[1] and pertinent law, the Court grants Defendants' motions but will allow repleading of some of Plaintiffs' claims.

## I.  Legal Standards

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[D]etailed factual allegations" are not required, but "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). In considering a motion to dismiss brought under Rule 12(b)(6), a court limits its "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." LaGrasta v. First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir. 2004).

## II.  Factual and Procedural Background[2]

### A.  Allegations in the Complaints (Docs. 1 & 30)

Defendant ALG is a law firm with its principal place of business in Miami Lakes,

---

[1] The pertinent filings are Defendants' motions (Docs. 12 & 50); the United States' memorandum (Doc. 27); Defendants' reply (Doc. 46) regarding their first motion; and Intervenor-Plaintiffs' memorandum (Doc. 51).

[2] The Background section is taken from Plaintiffs' Complaints, the well-pleaded allegations of which are accepted as true at this stage of the case.

Florida, and several offices throughout the state, including in Orlando. (Doc. 1 ¶ 8). "From 2009 through at least 2015, ALG purported to be a legal services provider and offered loan modification and foreclosure rescue services." (Id.). Defendant Jon Lindeman (Mr. Lindeman) is an attorney who opened ALG with his wife, Defendant Ephigenia K. Lindeman (Mrs. Lindeman) in 2008. (Id. ¶ 9). Mr. Lindeman serves as the General Managing Partner and President of ALG, (id.), while Mrs. Lindeman—a non-lawyer—is ALG's Chief Financial Officer, Director of Marketing, and Chief Mortgage Investigator and Auditor, (id. ¶ 10).

Defendants allegedly "deliberately targeted . . . homeowners because of their Hispanic national origin for a scheme involving unfair and predatory loan modifications and foreclosure rescue services." (Id. ¶ 11). They did so by using "Spanish-language advertising that falsely promised to cut . . . mortgage payments in half." (Id. ¶ 12). Defendants allegedly charged thousands of dollars in advance fees as well as ongoing monthly fees of up to $550, urging homeowners "to stop making monthly mortgage payments and to stop communication with their lenders." (Id.).

In their advertisements, Defendants misrepresented that they "could quickly obtain mortgage modifications that would reduce homeowners' mortgage payments," but "Defendants took little action to obtain modifications." (Id. ¶ 14). Defendants allegedly "exploited the limited English proficiency of" homeowners by advertising and conducting meetings in Spanish but then requiring "clients to sign English-language contracts, with only payment provisions translated." (Id. ¶ 17). The three Intervenor-Plaintiffs owned homes in Orlando, and the stories of their dealings with Defendants are similar.

### 1. Intervenor Hurtado

In February 2014, while current on her mortgage but facing a scheduled payment increase, Intervenor Lucia Hurtado—a native of Colombia who is limited English

proficient—went to ALG's office in Orlando seeking mortgage modification assistance after viewing a Spanish-language ALG advertisement on television. (Doc. 1 ¶¶ 5, 24–27; Doc. 30 ¶¶ 28, 30–33). Hurtado signed a retainer agreement that required an advance fee of $5,700 for mortgage modification assistance. (Doc. 1 ¶ 28; Doc. 30 ¶ 41). An ALG employee instructed Hurtado to stop making mortgage payments, and Hurtado complied. (Doc. 1 ¶ 29).

After paying ALG about $2,000 within a few weeks of signing the retainer agreement, Hurtado paid monthly installments of $535 to ALG. (Id. ¶ 31). The ALG employee with whom she met told her "that she would be fined if she ever stopped paying ALG the monthly fee." (Id. ¶ 30). And when Hurtado called ALG, she "was never able to speak with anyone about the details of her case." (Id. ¶ 35).

Over the course of about fourteen months, Hurtado paid ALG approximately $8,420, "but she never received a mortgage modification or an offer of a modification while working with ALG." (Id. ¶ 37; see also Doc. 30 ¶ 55). In March 2015, Hurtado's loan servicer initiated foreclosure proceedings, and ALG entered an appearance in the case the following month. (Doc. 1 ¶ 36). In June 2015, Hurtado asked ALG to cancel its services, but ALG did not withdraw from her case until July 23, 2015. (Id. ¶ 38). Ultimately, Hurtado "resorted to selling her house in a short sale" after not obtaining a mortgage modification. (Id. ¶ 39; see also Doc. 30 ¶ 54).

### 2. Intervenor Roman

Intervenor Noemi Roman is a native of Puerto Rico who is limited English proficient. (Doc. 1 ¶ 6; Doc. 30 ¶ 57). In February 2010, after not paying her mortgage for two months, Roman went to ALG's office in Orlando to seek mortgage modification assistance after hearing and viewing advertisements on Spanish-language radio and television. (Doc. 1

¶¶ 41–43). The ALG employee with whom Roman met falsely promised "that ALG could reduce the[] mortgage payment by half," advised Roman to stop making mortgage payments, and told her not to accept correspondence or calls from her bank. (Id. ¶¶ 44–45; see also Doc. 30 ¶¶ 61 & 63). Roman followed these instructions and made no further mortgage payments. (Doc. 1 ¶ 45; Doc. 30 ¶ 74). Roman paid $4,800 for ALG's promised loan modification services, taking out a loan to do so. (Doc. 1 ¶ 48; Doc. 30 ¶¶ 67–68).

In June 2010, Roman's lender filed a foreclosure complaint in state court and two weeks later offered Roman a mortgage modification. (Doc. 1 ¶ 52). ALG, however, advised Roman to reject the modification offer. (Id.). Roman paid over $13,500 for ALG's services but never obtained a mortgage modification. (Id. ¶ 61; Doc. 30 ¶ 86). Ultimately, the lender was granted summary judgment and Roman's home was sold to a third party at a foreclosure sale. (Doc. 1 ¶¶ 56–58).

### 3. Intervenor Roque

Intervenor Argentina Roque is a native of the Dominican Republic who is limited English proficient. (Id. ¶ 7; Doc. 30 ¶ 88). In January 2010, after seeing an advertisement on Spanish-language television for ALG's services, Roque went to ALG's Orlando office seeking assistance with a mortgage modification. (Doc. 1 ¶¶ 64–65; Doc. 30 ¶¶ 90–91). There, an ALG employee told Roque not to make further mortgage payments and that "she should use the money set aside for the mortgage payment to pay ALG instead." (Doc. 1 ¶ 66; see also Doc. 30 ¶ 93). Doing as instructed, Roque stopped making mortgage payments. (Doc. 1 ¶ 66; Doc. 30 ¶ 99). Roque paid ALG a fee of $2,800 in installments from January to May 2010. (Doc. 1 ¶ 67; Doc. 30 ¶ 99).

Roque's lender initiated foreclosure proceedings in April 2010. (Doc. 1 ¶ 71; Doc. 30 ¶ 105). After the first case was dismissed for lack of prosecution in June 2013, the

lender filed again in March 2014. (Doc. 1 ¶¶ 71–72; Doc. 30 ¶¶ 105–06). Although ALG entered an appearance in the foreclosure case, it did not file a responsive pleading. (Doc. 1 ¶ 72; Doc. 30 ¶ 106). Roque tried to terminate her relationship with ALG, but ALG staff told her "that if she did not continue making payments to ALG she could lose her home to foreclosure." (Doc. 1 ¶ 74; see also Doc. 30 ¶ 108). ALG eventually withdrew as counsel in the foreclosure case in February 2015, (Doc. 1 ¶ 77), and Roque obtained a loan modification offer from her lender with the free assistance of a nonprofit organization, (id. ¶ 79; see also Doc. 30 ¶ 112). Roque had paid ALG more than $18,500. (Doc. 1 ¶ 78; Doc. 30 ¶ 111).

### B.    Procedural History

The FHA, which reflects "the policy of the United States to provide . . . for fair housing," 42 U.S.C. § 3601, creates several mechanisms for enforcement of its provisions. See 42 U.S.C. §§ 3610 & 3612 ("Administrative enforcement" and "Enforcement by Secretary," respectively); id. § 3613 ("Enforcement by private persons"); id. § 3614 ("Enforcement by Attorney General"). This case originated under both the administrative enforcement provisions of §§ 3610 and 3612 as well as the Attorney General enforcement provisions of § 3614.

Hurtado, Roman, and Roque filed complaints of national origin discrimination with the Secretary of Housing and Urban Development under 42 U.S.C. § 3610(a).[3] (Doc. 1 ¶ 81; Doc. 30 ¶ 113). The Secretary then investigated the complaints, "determined that reasonable cause existed to believe that Defendants engaged in illegal discriminatory

---

[3] This provision of the FHA states in part that "[a]n aggrieved person may, not later than one year after an alleged discriminatory housing practice has occurred or terminated, file a complaint with the Secretary alleging such discriminatory housing practice." 42 U.S.C. § 3610(a)(1)(A)(i).

housing practices against each of the" Intervenors, (Doc. 1 ¶ 83; <u>see also</u> Doc. 30 ¶ 115), and, on September 6, 2018, issued a Charge of Discrimination against Defendants under 42 U.S.C. § 3610(g)(2)(A),[4] (Doc. 1 ¶ 84; Doc. 30 ¶ 116).

"When a charge is filed under section 3610 . . . , a complainant, a respondent, or an aggrieved person on whose behalf the complaint was filed[] may elect to have the claims asserted in that charge decided in a civil action" in lieu of an administrative hearing. 42 U.S.C. § 3612(a). Defendants made such an election, (Doc. 1 ¶ 85; Doc. 30 ¶ 118), and the Secretary then authorized the Attorney General to commence a civil action,[5] (Doc. 1 ¶ 87; Doc. 30 ¶ 119). The Attorney General accordingly filed this lawsuit on October 29, 2018, recounting the experiences of the Hurtado, Roman, and Roque families and alleging violations of several of the FHA's anti-discrimination provisions—42 U.S.C. §§ 3604(a), 3604(b), 3605, and 3617. (Doc. 1). And, invoking its authority under § 3614, the United States also alleges in its Complaint that the Defendants engaged in a pattern or practice of FHA violations. (Doc. 1 at 22–23); <u>see</u> 42 U.S.C. § 3614(a) (allowing the Attorney General to commence a civil action "[w]henever the Attorney General has reasonable cause to believe that any person . . . is engaged in a pattern or practice of resistance to the full enjoyment of any rights granted by this subchapter or that any group of persons has been denied any of the rights granted by this subchapter and such denial raises an

---

[4] This provision states that "[i]f the Secretary determines that reasonable cause exists to believe that a discriminatory housing practice has occurred or is about to occur, the Secretary shall . . . immediately issue a charge on behalf of the aggrieved person[] for further proceedings under section 3612 of this title." 42 U.S.C. § 3610(g)(2)(A).

[5] Section 3612(*o*)—titled "Civil action for enforcement when election is made for civil action"—provides in part: "If an election is made under subsection (a), the Secretary shall authorize, and not later than 30 days after the election is made the Attorney General shall commence and maintain, a civil action on behalf of the aggrieved person in a United States district court seeking relief under this subsection." 42 U.S.C. § 3612(*o*)(1).

issue of general public importance").

And the FHA allows "[a]ny aggrieved person with respect to the issues to be determined in a civil action . . . [to] intervene as of right in that civil action." 42 U.S.C. § 3612(o)(2). Hurtado, Roman, and Roque moved to intervene under this provision, (see Doc. 28), and the Court granted that motion, (see Doc. 29). Intervenor-Plaintiffs then filed their Complaint in Intervention on March 18, 2019, alleging, like the United States, violations of §§ 3604(a), 3604(b), 3605, and 3617. (Doc. 30). Defendants now move to dismiss all claims in both the United States' Complaint and the Complaint in Intervention under Federal Rule of Civil Procedure 12(b)(6), asserting that their alleged actions do not amount to housing discrimination under the FHA.

III. **Discussion**

A. **42 U.S.C. § 3604(a) (Intervenors' Count I and part of the United States' Count I)**

In their first claim, Plaintiffs allege that Defendants violated 42 U.S.C. § 3604(a), which provides that it is "unlawful . . . [t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). This case does not involve the sale or rental of a dwelling, and Plaintiffs rely on the "otherwise make unavailable or deny[] a dwelling" portion of this subsection in bringing this claim.[6] The Court is not persuaded that Defendants' alleged conduct falls within § 3604(a)'s prohibitions.

Plaintiffs correctly point out that courts have construed § 3604(a) as covering

---

[6] To the extent Defendants argue that § 3604(a) only pertains to the sale or rental of a dwelling, (see Doc. 12 at 7–9), their motion misses the mark. The cases Defendants cite for this proposition do not limit § 3604(a) to the sale and rental contexts.

activities such as zoning,[7] sale of (or refusal to sell) homeowners' insurance,[8] racial steering,[9] eviction,[10] and other conduct occurring after acquisition of housing.[11] Plaintiffs emphasize the recognition of post-acquisition conduct as actionable in bringing their § 3604(a) claim, and Plaintiffs also rely on a "reverse redlining" theory in asserting this claim. The conduct alleged here, however, is different from zoning, insurance, steering, and eviction, and Plaintiffs' reliance on "reverse redlining" is unavailing.

First, Defendants' alleged conduct is not akin to zoning, provision of homeowners' insurance, steering, or eviction, all of which are mentioned as examples of § 3604(a)

---

[7] See Jackson v. Okaloosa Cty., 21 F.3d 1531, 1542–43 (11th Cir. 1994) (holding that the plaintiffs sufficiently stated a § 3604(a) claim where they alleged that the defendants "intentionally created a racially segregated public housing market by enacting [a policy that] was intended to exclude public housing from areas that are predominantly white," and "[t]hese alleged actions affect the availability of public housing in a substantial portion of [the housing authority's] territory").

[8] See, e.g., Ojo v. Farmers Grp., Inc., 600 F.3d 1205, 1208 (9th Cir. 2010) (holding that "the FHA prohibits . . . discrimination in both the denial and pricing of homeowner's insurance," noting that "the denial of homeowner's insurance can make housing unavailable," and concluding that HUD regulation regarding insurance was entitled to deference); NAACP v. Am. Family Mut. Ins. Co., 978 F.2d 287, 300–01 (7th Cir. 1992) (deferring to HUD regulation and concluding that "[s]ection 3604 applies to discriminatory denials of insurance, and discriminatory pricing, that effectively preclude ownership of housing because of . . . race").

[9] See United States v. Mitchell, 580 F.2d 789, 791 (5th Cir. 1978) ("Steering blacks to a particular group of apartments in a complex effectively denies access to equal housing opportunities. . . . [S]teering evidences an intent to influence the choice of the renter on an impermissible racial basis." (internal citation omitted)), abrogated by statute on other grounds as noted in United States v. City of Jackson, 359 F.3d 727, 735–37 (5th Cir. 2004).

[10] See, e.g., Cousins v. Bray, 297 F. Supp. 2d 1027, 1037–38 (S.D. Ohio 2003) (noting that § 3604(a) would be violated if race factored into landlords' decision to terminate tenancy).

[11] See generally Bloch v. Frischholz, 587 F.3d 771, 776 (7th Cir. 2009) ("[W]e agree . . . that § 3604(a) may reach post-acquisition discriminatory conduct that makes a dwelling unavailable to the owner or tenant, somewhat like a constructive eviction."); cf. Hunt v. Aimco Props., L.P., 814 F.3d 1213, 1221–24 & n.7 (11th Cir. 2016) (discussing analogous FHA provision covering disability discrimination, § 3604(f)(1), where landlord "made the [plaintiffs'] housing unavailable by refusing to renew their lease and directing them to vacate their apartment," though not evicting them).

violations in HUD regulations. See 24 C.F.R. §§ 100.60 &100.70. Unlike the actors in these other scenarios, Defendants in the case at hand could not, on their own, "make housing unavailable" to the Intervenors or others on the facts alleged. As Defendants note, here the lenders—not Defendants—"ultimately held the power to agree to the modification or to foreclose," (Doc. 12 at 9), and Defendants "maintained no power over the [Intervenors], or any power to impact [Intervenors'] purchase or rental of real estate they already possessed," (id.). The Court agrees that Plaintiffs' allegations do not bring Defendants' conduct within the § 3604(a)'s terms of "otherwise mak[ing] unavailable or deny[ing] a dwelling."

The allegations of the Complaint in Intervention are telling. Although the Intervenor-Plaintiffs begin by conclusorily alleging in their § 3604(a) count that Defendants "made housing unavailable on the basis of national origin," (Doc. 30 ¶ 124), they then allege that Defendants' actions "placed [homeowners] at risk of foreclosure and prospective loss of housing," (id. ¶ 125), and that the Intervenor-Plaintiffs suffered "the prospective loss of housing," (id. ¶ 126). But a "risk" of housing becoming unavailable or a "prospective" possibility of losing housing" is different from housing being made unavailable by the Defendants. Again, no facts are alleged supporting an inference that Defendants have the ability to "make housing unavailable."

Second, Plaintiffs make no headway by attempting to support their § 3604(a) claim with their assertions of "reverse redlining." While "[r]edlining is the practice of refusing to extend mortgage credit to minority borrowers on equal terms as to non-minority borrowers, . . . [r]everse redlining is the practice of extending mortgage credit on exploitative terms to minority borrowers." City of Miami v. Bank of Am. Corp., 800 F.3d 1262, 1267 (11th Cir.

2015), rev'd on other grounds, 137 S. Ct. 1296 (2017). Both redlining and reverse redlining have been recognized as plausible theories under § 3604 because they can "make housing unavailable." And reverse redlining, like redlining, can occur not only in extension of credit but also in other activities, such as the sale of homeowners' insurance. See, e.g., NAACP v. Am. Family Mut. Ins. Co., 978 F.2d 287, 300–01 (7th Cir. 1992); 24 C.F.R. § 100.70(d)(4) (providing that prohibited activities include "[r]efusing to provide . . . property or hazard insurance for dwellings or providing such . . . insurance differently because of race, color, religion, sex, handicap, familial status, or national origin").

But here, Plaintiffs do not allege reverse redlining in the context of conduct that otherwise falls within § 3604(a); calling their theory "reverse redlining" does not transform an unactionable claim into an actionable one. Plaintiffs do allege exploitation and predatory behavior, alleging that Defendants engaged in reverse redlining in the targeting of their services toward Hispanic homeowners. Plaintiffs conclusorily allege that Defendants targeted Hispanic homeowners for "predatory loan modifications," (see, e.g., Doc. 1 ¶ 11), but Defendants are not alleged to make loan modifications. Instead, they allegedly offer to assist homeowners with negotiating loan modifications with the homeowners' lenders. Plaintiffs cite no case—and the Court has found none—recognizing reverse redlining in the offering of "foreclosure assistance" as an actionable claim under § 3604. Again, § 3604(a) prohibits "mak[ing] a dwelling unavailable," and the allegations against Defendants do not plausibly state a claim that Defendants did so or could do so.

In sum, although the FHA is a remedial statute that is to be construed broadly, see, e.g., Hunt v. Aimco Props., L.P., 814 F.3d 1213, 1223 (11th Cir. 2016), Plaintiffs are attempting to stretch § 3604(a) too far here. Plaintiffs cite no decision in which § 3604(a)

has been applied to similar facts, and this Court does not read § 3604(a) as encompassing the alleged acts of Defendants. Accordingly, Defendants' motions to dismiss are granted on Plaintiffs' § 3604(a) claims.

**B.     42 U.S.C. § 3604(b) (Intervenors' Count II and part of the United States' Count I)**

Plaintiffs allege in their second claim that Defendants violated § 3604(b). This subsection provides that it is "unlawful . . . [t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). This provision thus states two alternatives: (1) it speaks of discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling"; and (2) it speaks of discrimination "in the provision of services or facilities in connection" with sale or rental of a dwelling. Cf. 24 C.F.R. § 100.65(a) (HUD regulation tracking the language of § 3604(b) and providing that it is unlawful "to impose different terms, conditions or privileges relating to the sale or rental of a dwelling or to deny or limit services or facilities in connection with the sale or rental of a dwelling").

Plaintiffs' allegations and theories under this section are transient and confusing. In its Complaint, the United States merely tracks the language of § 3604(b) without identifying how Defendants allegedly violated it. (See Doc. 1 at 21–22). And in its memorandum, the United States combines the two portions of § 3604(b), arguing that the Complaint "alleges that Defendants provided services 'in connection with' 'the terms, conditions, or privileges of sale of a dwelling.'" (Doc. 27 at 14). In the Complaint in Intervention, the Intervenor-Plaintiffs allege that Defendants violated § 3604(b) by "offering discriminatory terms, conditions, or privileges in their retainer agreements and communications" with

Intervenors. (Doc. 30 ¶ 130). But in their memorandum, the Intervenor-Plaintiffs appear to rely on the "services" portion of § 3604(b), arguing that "they were targeted for predatory services." (Doc. 51 at 8).

In any event, the Court does not discern an actionable § 3604(b) claim from the factual allegations of the Complaints. Defendants assert that the services they allegedly provided "do not fall under the types of services recognized as actionable under the FHA," (Doc. 12 at 10), and the Court agrees—regardless of whether the allegations are analyzed under the "terms, conditions, or privileges" component of § 3604(b) or the "provision of services or facilities" component.

Although the Court disagrees with Defendants' assertion that actionable services under § 3604(b) "must be limited to the sale or rental of a dwelling," (id. at 11)—post-acquisition conduct can be actionable—the Court nevertheless concludes that the allegations against Defendants do not fall within this provision. As with their § 3604(a) claim, Plaintiffs cite no case recognizing an actionable § 3604(b) claim under circumstances like those alleged in the case at bar. Plaintiffs again rely on cases against—among others—insurers, lenders, and mortgage servicers, but Defendants did not provide such services here. Instead, they offered to provide assistance in obtaining a mortgage modification from lenders—a step removed. Thus, even assuming that those types of services are within the scope of § 3604(b), Defendants are not alleged to have provided them.

And the HUD regulation that parallels § 3604(b) gives examples of prohibited actions, and none is similar in kind to the alleged actions of Defendants here. See 24 C.F.R. § 100.65(b) (listing as examples "[u]sing different provisions in leases or contracts,"

"[f]ailing or delaying maintenance or repairs," "[f]ailing to process an offer . . . or to communicate an offer," "[l]imiting the use of privileges, services or facilities associated with a dwelling," and "subjecting a person to harassment . . . that has the effect of imposing different terms, conditions, or privileges relating to the sale or rental of a dwelling or denying or limiting services or facilities in connection with the sale or rental of a dwelling"). In sum, the Court rejects Plaintiffs' effort to expand the scope of § 3604(b) to cover the allegations of this case. Defendants' motions to dismiss the § 3604(b) claims will be granted.

### C. 42 U.S.C. § 3605 (Intervenors' Count III and part of the United States' Count I)

Plaintiffs' third claim is for violation of 42 U.S.C. § 3605(a). This provision makes it "unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C. § 3605(a). Plaintiffs allege that Defendants violated this subsection, but they fail to state a § 3605(a) claim because they do not allege facts plausibly supporting a conclusion that Defendants' "business includes engaging in residential real estate-related transactions" within the meaning of this section or that "such a transaction" was involved here.

Subsection 3605(b) defines "residential real estate-related transaction" for the purposes of § 3605(a) as "mean[ing] any of the following":

> (1) The making or purchasing of loans or providing other financial assistance—

>> (A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or

>> (B) secured by residential real estate.

(2) The selling, brokering, or appraising of residential real property.

42 U.S.C. § 3605(b).  Defendants are not alleged to have sold, brokered, or appraised residential real property so as to bring them within § 3605(b)(2).  Nor are they alleged to have made or purchased loans under the first part of § 3605(b)(1).  Thus, the only possibility here is that Defendants' "business includes engaging in . . . providing other financial assistance . . . for purchasing, constructing, improving, repairing, or maintaining a dwelling . . . or secured by residential real estate" under the second part of § 3605(b)(1).  But Plaintiffs' contentions that Defendants provided "other financial assistance" are not well-taken.

To the extent that the Complaints allege that Defendants provided "financial assistance," they do so only conclusorily, and the alleged business and actions of Defendants cannot reasonably be construed as amounting to the provision of "financial assistance" within the meaning of § 3605.  The United States' Complaint mentions "financial assistance" only twice, alleging:  (1) that Intervenors and others "sought the loan modifications promised by Defendants in order to secure the financial assistance necessary" to reduce their payments and keep their homes, (Doc. 1 ¶ 19); and (2) that Defendants interfered with the ability of Intervenors and others "to maintain their homes or to receive legitimate financial assistance to maintain their homes," (id. ¶ 22).  But these allegations refer to homeowners attempting to obtain "financial assistance" from third parties—not from Defendants.

The United States asserts that "§ 3605 covers a broad range of financial assistance, including mortgage modifications, and discrimination in 'making available' such modifications, even by a law firm, is a violation of § 3605." (Doc. 27 at 17).  The United States also asserts in its response to the motion to dismiss that "Defendants discriminated

in making loan modifications available, and they discriminated in providing foreclosure rescue services, another form of financial assistance." (Id. at 18). But here the United States distorts the language of the statute and attempts to gloss over the fact that Defendants' business does not include providing financial assistance. There are no plausible factual allegations that Defendants provide "mortgage modifications," and the United States' conclusory assertions that "foreclosure rescue services" and similar activities constitute "financial assistance" fall short.

Intervenors mention "financial assistance" four times in their Complaint, alleging: (1) that Defendants "engag[ed] in residential real estate related transactions through [their] mortgage modification scam which offered predatory financial assistance," (Doc. 30 ¶ 2); (2) that "Defendants instructed ALG staff to give advice to Spanish[-]speaking homeowners seeking financial assistance," (id. ¶ 24); (3) that "Defendants provided financial assistance by offering mortgage modification assistance," (id. ¶ 136); and (4) that "Defendants purported to provide financial assistance through mortgage modification assistance," (id. ¶ 143).[12] Again, however, these conclusory categorizations of Defendants' services as "financial assistance" are insufficient. Providing—or purporting to provide—assistance with *obtaining* financial assistance is not the same as "providing financial assistance."

The decision of the Supreme Court of Illinois in People ex rel. Madigan v. Wildermuth, 91 N.E.3d 865 (Ill. 2017), is instructive. There, the court analyzed whether the defendants—who, like Defendants here, included a law firm and offered "loan modification services"—engaged in "real estate transactions" under a similarly worded

---

[12] This last paragraph is part of Intervenors' § 3617 claim, not their § 3605 claim. (See Doc. 30 at 22).

provision in the Illinois Human Rights Act (modeled on § 3605) "by claiming to negotiate loan modifications and short sales on behalf of their clients." 91 N.E.3d at 868. The statute at issue in <u>Wildermuth</u> barred discrimination by "an owner or any other person engaging in a real estate transaction," and "real estate transaction" was defined as including "providing other financial assistance" in the same terms as § 3605(b). <u>Id.</u> at 870–71 (emphasis removed) (quoting 775 Ill. Comp. Stat. 5/3-102 & 5/3-101(B)).

Relying on a reverse redlining theory, the Illinois Attorney General asserted in <u>Wildermuth</u> that the "Defendants engaged in 'real estate transactions' . . . when they negotiated loan modifications and short sales on behalf of consumers." <u>Id.</u> at 869. The Attorney General argued that "'other financial assistance' . . . should be construed liberally to include defendants' business model of assisting customers with applying for loan modifications." <u>Id.</u> at 871. In rejecting this contention, the <u>Wildermuth</u> court explained:

> The statute does not impose liability for any form of 'assistance' that defendants may have undertaken. Rather, liability exists for providing "*financial* assistance" in a discriminatory manner. Webster's Third New International Dictionary defines "financial" as "relating to finance." "Finance," under the dictionary definition most relevant to the subject and purpose of the statute, means "to provide with necessary funds in order to achieve a desired end . . . ."
>
> Here, defendants are alleged to have provided assistance with filling out paperwork for modifications to already-existing loans. There is no allegation that defendants themselves provided any funds to their clients in order to achieve the desired end of obtaining a loan modification.

<u>Id.</u> at 872 (citations omitted). This Court agrees with this analysis of the meaning of "financial assistance." <u>See also</u> <u>Beard v. Worldwide Mortg. Corp.</u>, 354 F. Supp. 2d 789, 809 (W.D. Tenn. 2005) (dismissing § 3605 claim against title company and notary who acted as settlement agent because they were not alleged to have "engaged in the business

of residential real estate transactions" through the provision of financial assistance or otherwise).

Despite Plaintiffs' conclusory assertions to the contrary, providing assistance with obtaining mortgage modifications does not fit within § 3605's definition of "providing . . . financial assistance." Thus, Defendants' alleged actions are not encompassed by § 3605(a)'s prohibitions, and Defendants' motion to dismiss the § 3605(a) claims must be granted.

### D. 42 U.S.C. § 3617 (Intervenors' Count IV and part of the United States' Count I)

Plaintiffs' fourth claim is under 42 U.S.C. § 3617, which is titled "Interference, coercion, or intimidation." Section 3617 provides: "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617.

Plaintiffs' theory under this section is shifting and unclear. The United States' Complaint makes no effort to explain which actions of Defendants constituted which prohibited conduct under § 3617. Instead, the United States merely tracks the statutory language and alleges that "[b]y the actions and statements referred to in" all the preceding paragraphs of the United States' Complaint, "Defendants have . . . [c]oerced, intimidated, threatened, or interfered with" Intervenors and others. (Doc. 1 ¶ 90.d.). For their part, Intervenors allege in their Complaint that Defendants "threatened" them "with loss of housing if they discontinued paying their monthly fee to coerce [Intervenors] into continued participation in their discriminatory scam." (Doc. 30 ¶ 144). Thus, Intervenors seem—in

their Complaint—to be alleging "coerc[ion]" and "threat[s]" in violation of § 3617. But in their response to Defendants' motion to dismiss, Intervenors refer not to coercion or threats but to the other two prohibited acts in § 3617—"interference" and "intimidation"—neither of which was mentioned in their Complaint. (See Doc. 51 at 14–15).

Plaintiffs' shifting contentions render meaningful analysis of the sufficiency of these claims difficult. The § 3617 claims will be dismissed, but Plaintiffs will be granted leave to replead claims under § 3617. If Plaintiffs choose to replead, they should identify the FHA right allegedly infringed and the manner in which they are alleging Defendants allegedly infringed that right.

### E.    42 U.S.C. § 3614 (United States' Count II)

In Count II of its Complaint, the United States brings a claim under 42 U.S.C. § 3614(a), which is titled "Pattern or practice cases" and provides:

> Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this subchapter, or that any group of persons is being denied any of the rights granted by this subchapter and such denial raises an issue of general public importance, the Attorney General may commence a civil action in any appropriate United States district court.

The United States alleges that Defendants' conduct both constitutes a "pattern or practice" under the first part of this provision and "raises an issue of general public importance" under the second part of this provision. (Doc. 1 at 22–23).

Defendants argue that Count II must be dismissed because § 3614 does not give rise to an independent cause of action—instead only giving the Attorney General authority to sue—and because even if did, the United States has not pleaded sufficient facts to state a claim under § 3614. Although the Court disagrees with Defendants' first contention, the

§ 3614 claim must be dismissed in light of the dismissal of Plaintiffs' other claims—the claims upon which the § 3614 claim is based.

Section 3614 is indeed couched in terms of granting authority to the Attorney General to "commence an action." But as the United States notes in its response, § 3614 describes different actionable circumstances than the other provisions of the FHA—requiring either a "pattern or practice" or "an issue of general public importance"—and it allows imposition of a civil penalty—an additional, different remedy. See 42 U.S.C. § 3614(d)(1)(C) (providing that "[i]n a civil action under [§3614(a)], the court . . . may, to vindicate the public interest, assess a civil penalty against the respondent"). Thus, the Court does not fault the United States for setting forth this claim as a separate count in its Complaint.

However, in light of the Court's conclusion that the Complaints do not state a violation of § 3604(a), § 3604(b), § 3605, or § 3617, the § 3614 claim necessarily fails here. That is, because Plaintiffs have not yet alleged a plausible FHA violation under those other provisions, they also have not successfully alleged a "pattern or practice" of violations or that a group of persons has been denied rights. But, as with the § 3617 claim, the Government will be granted leave to replead entitlement to relief under § 3614.[13]

---

[13] If Plaintiffs had elsewhere alleged a violation, the United States' pattern or practice allegations likely would be sufficient. "To establish a pattern or practice of discrimination, the United States must [ultimately] prove 'more than the mere occurrence of isolated or accidental or sporadic discriminatory acts[;]' rather, it must prove by preponderance of the evidence that discrimination is the Defendants' 'standard operating procedure.'" United States v. Fountain View Apartments, Inc., No. 08-cv-00891-Orl-35DAB, 2009 WL 10671251, at *6 (M.D. Fla. Dec. 22, 2009) (alteration in original) (additional internal quotation marks omitted) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 336 (1977)). "Each pattern or practice case turns on its own facts," and "there is no mathematical formula for determining whether a defendant has engaged in a pattern or practice of discrimination." Id.

## F.    Leave to Amend

In their opposition memoranda, the United States and Intervenor-Plaintiffs request leave to amend, though they do not assert how the pleading of their claims could be improved by amendment. Because the claims under §§ 3604 and 3605 fail as a matter of law, the Court finds that repleading them would be futile.[14] Those claims accordingly will be dismissed with prejudice. However, because the Court cannot determine at this point that it is impossible for Plaintiffs to state a § 3617 claim or for the United States to plead a § 3614 pattern and practice claim based on a § 3617 claim, those claims will be dismissed without prejudice and with leave to amend.

## IV.    Conclusion

As set forth above, it is **ORDERED** as follows:

1.    Defendants' motions (Docs. 12 & 50) are **GRANTED** insofar as they seek dismissal of Plaintiffs' claims and are **DENIED as moot** insofar as they request a more definite statement.

---

Here, the United States' Complaint alleges national origin discrimination against three specific Intervenors and their families. The United States also repeatedly refers in the Complaint to Intervenors "and other homeowners," (see, e.g., Doc. 1 ¶¶ 11 & 20), to Intervenors and "other Hispanic homeowners," (see, e.g., id. ¶¶ 12, 17, & 19), and to Intervenors "and other clients," (see, e.g., id. ¶ 12). And as noted in Fountain View Apartments, courts have held that three violations of the FHA rise to the level of a "pattern or practice." See 2009 WL 10671251, at *6 (collecting cases). Thus, if the United States' allegations were sufficient to state a claim under § 3604, § 3605, or § 3617, its assertions under § 3614 would likely have survived as well.

[14] Plaintiffs cite Vibe Micro, Inc. v. Shabanets, 878 F.3d 1291 (11th Cir. 2018), for the proposition that they must be granted one opportunity to amend. But the holding of Vibe Micro is limited to "non-merits dismissals on shotgun pleading grounds." 878 F.3d at 1295. Here, although Defendants did move to dismiss the Complaints on shotgun pleading grounds, the Court is dismissing the § 3604 and § 3605 claims not on shotgun pleading grounds but on their merits. The Court has carefully analyzed Plaintiffs' extensive allegations and concludes that amendment of these claims would be futile. See, e.g., EEOC v. STME, LLC, --- F.3d ---, 2019 WL 4314998, at *9–10 (11th Cir. Sept. 12, 2019).

2.  Plaintiffs' claims under 42 U.S.C. §§ 3604(a), 3604(b), and 3605(a) are **DISMISSED with prejudice**.

3.  Plaintiffs' claims under 42 U.S.C. § 3617, and the Government's claim under 42 U.S.C. § 3614, are **DISMISSED without prejudice**.

4.  Plaintiffs may file amended complaints consistent with the rulings in this Order **on or before Friday, October 18, 2019**. Failure to file amended complaints by this deadline may result in dismissal of the remaining claims with prejudice, without further notice.

**DONE** and **ORDERED** in Orlando, Florida, on September 2 7, 2019.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record